CatRon, J.
The bill charges, that in 1813 Bennet Searcy made a verbal contract with M’Clure for ten feet of ground, lying on the public square in Clarksville, extending [336] about sixty feet back, part of lot No. 20, for which said Searcy was to give M’Clure whatever the ground was reasonably worth.
That M’Clure was desirous Searcy should become his neighbor, and that Searcy might er.ect a dwelling-house partly upon the adjoining lot of Searcy, and upon the ten feet of ground.
That in pursuance of the contract so made, and according to its terms, Searcy took peaceable possession of the said ten feet of ground in the year 1813, enclosed the same, and partly erected thereon the dwelling-house occupied by complainant, Patton, at the filing of the bill. That since the erection of the dwelling-house, other buildings have been erected upon said ground, with the knowledge and approbation of M’Clure.
That on the 1st day of May, 1817, Patton, the complainant, purchased the ground upon which said buildings were erected, including the ten teet, with other property from Searcy, for a valuable consideration, and got said Searcy’s deed of the above date; and from the time of the purchase until the 1st of January, 1820, had continued in the unmolested enjoyment of said house and premises, when an action of ejectment was commenced by M’Clure against complainant for the ten feet of ground. Complainant prays that the ten feet of ground may be specifically decreed to him, and the defendant, M’Clure, enjoined from prosecuting his action of ejectment.
This bill was filed 20th April, 1820. The defendant by his answer admits he gave Searcy leave to erect part of his house (a framed one) upon the ten feet of ground, but denies he ever contracted to sell the ground to Searcy as alleged, and as a defence relies upon the Statute of Frauds.
No proof was made that any money had ever been paid by Searcy to M’Clure for the ten feet of ground, but it was proven that M’Clure was to have so much of one of Searcy’s lots, also conveyed by the deed to Patton, as was of value equal to the ten feet.
That Searcy contracted by parol for the ten feet of ground is proven, as are the other allegations in the bill.
[337] By our Statute of Frauds, 1801, ch. 25, it is enacted that no *637 action shall he brought whereby to charge any person upon any contract for the sale of lands, tenements, or hereditaments, &c. unless the promise or agreement upon which such action shall be brought, or some memorandum or note thereof shall be in writing, and signed by the party to be charged therewith.
Numerous are the decisions of the English Court of Chancery declaring cases not within the statute, where there has been a part performance of the contract, although the same was not in writing. Our statute is a copy of the British Statute of Frauds, and should receive the same construction that the British statute ought originally to have received.
Aside from authority, our statute is simple and unambiguous in its provisions, is consistent with our Constitution, and bars all suits upon parol contracts for the sale of lands. Buies of construction deduced from legal learning can add nothing to explain the meaning of the Legislature. The English judges of modern times sufficiently lament the decisions of their predecessors going to relieve against cases of supposed or real hardship affected by the Statute of Frauds. For instance, says Lord Kenyon, I lament extremely that exceptions were ever introduced in construing the Statute of Frauds ; it is a very beneficial statute, and if the courts had at first abided by the strict letter of the Act, it would have prevented a multitude of suits that have since been brought. 7 Term Rep. 201.
Lord Eldon expresses himself to the same effect in Forster v. Hale, 3 Ves. 712. Again says Lord Eldon in Cooth v. Jackson, 6 Ves. 32, the cases have already gone so far as nearly to cancel the statute.
In the case Ex parte Whitbread, 19 Ves. 210, 212, Lord Eldon says the statute shall not be repealed further by him than it has been by his predecessors, to whose authority he submits. He says, furthermore, that the evidence in that case is so imperfect as to leave the Court in doubt what the contract was. All of this goes, he remarks, to prove that, departing from the rule laid down in the statute, we have no rule to go by. •
[338] Lord Redesdale says in Lindsay v. Lynch, 2 Sch. & Lef. 5, that the decisions have opened a new door to fraud and to perjury, and regrets that the statute had ever been departed from.
In Blore v. Sutton, Sir Wm. Grant, Master of the Rolls (1817, 3 Mer. Rep. 247), says, were he to decree for complainant in that case, it would be to break in upon the Statute of Frauds, without the existence of any of the pretexts on which it had been already too much infringed.
In the cause of Grant v. Naylor, 4 Cranch, 235, the Supreme Court of the United States refused to hear proof to explain a mistake in a letter of the name of the mercantile firm, which letter was relied on by the plaintiff as evidence in writing of a collateral undertaking for the debt and default of another. The letter was addressed by Grant to John and Joseph Nay-lor, whereas the firm consisted of John and Jeremiah N. Says the Chief *638 'Justice, in delivering the opinion of the Court: “ That the letter was designed for John and Jeremiah Naylor .cannot be doubted, but the principles which require that a promise to pay the debt of another shall be in writing, and which will not permit a written contract to be explained by parol testimony, originated in a wise policy, which this Court cannot relax so far as to except from its operation cases within the principles.” It is then remarked that the Court will not further relax the construction of the statute than it has already been done. That is, the Supreme Court will not go further than the State courts have gone in relaxing the construction of the Statute, that Court being bound by the decisions of the State courts of the State from which the cause comes up, if upon the construction of a statute of the State. Hence the doctrine holden by the Court is recited moré to show the sense of that distinguished tribunal upon the construction of the Statute than as an authority. The courts of this State are not constrained by authority to follow the English decisions. For myself, I disclaim all power in a court of equity to relieve against the provisions of a statute in any case. This is the rule laid down by Lord Bacon, and is believed to be the correct one. 7 B. W. 269. It follows that no parol proof can [339] be heard to establish such contract, nor any proof of part performance from which the contract might be inferred; because this would still be but parol proof of a circumstantial character. The agreement upon which the action was brought must be in writing, signed by the party charged therewith, says the statute, and upon no other proof shall an action be brought. Of course all parol evidence must be rejected as inadmissible to prove the contract of purchase by Searcy from M’CIure.
Stripped of this proof, and how does the present cause stand ? That Searcy, by the consent of M’CIure, erected part of his dwelling-house and some appurtenant buildings upon the ten feet of ground, enclosed the same, resided thereon from 1813 to 1817, when he sold to the complainant, Patton, for a- full and fair price without any objections being made by M’CIure. Under such circumstances, is M’CIure estopped as against Patton, from prosecuting his action of ejectment for the ten feet of ground ?
It is a rule in equity that if one man knowingly, though he does it passively by looking on, suffer another to purchase and expend money upon land, under an erroneous opinion of title, without making his claim known, he shall not afterwards be permitted to exercise his legal right against such person. To do so would be an act of fraud and injustice, and his conscience would be bound by this equitable estoppel. The East India Company v. Vincent, 2 Atk. 83; Hunsden v. Cheney, 2 Ves. 150; Hanning v. Ferrers, 1 Eq. Ca. Abr. 356, Pl. 10; Raw et al. v. Potts, Prec. in Ch. 35; Styles v. Cooper, 3 Atk. 692; Jackson v. Cator, 5 Ves. 688; Dann v. Spurrier, 7 Ves. 231; Wendel v. Van Rensselaer, 1 John. Ch. Rep. 354; Storrs v. Brooks & Barker, 6 John. Ch. Rep. 166.
*639 Does the present cause fall within the foregoing class of causes ? Did M’Clure stand by and knowingly permit Patton to purchase from Searcy, and pay his money, without making his claim known, Patton being ignorant of such outstanding title in M’Clure ? No such case is set forth in the bill. It is not pretended by the complainant but that he had full knowledge of the fact that Searcy’s claim to the [340] ten feet of ground rested alone upon the parol contract of 1813. Patton, then, stands on the same footing that Searcy did, from whom he purchased. Hence the question is restricted to this: Is M’Clure estopped from asserting his title at law against the heirs of Searcy ? It may be true that M’Clure imposed upon Searcy in permitting him to build upon the ground without notifying him that he intended to assert his claim ; but can this Court give relief in such a case without manifestly violating the Statute of Frauds ? Searcy improved with full knowledge that he had no title, and relied upon the honor of M’Clure, without any imposition as to the nature of M’Clure’s title. The bill presents a state of facts wholly without the range of the foregoing class of cases. This is the doctrine holden in the English Court of Chancery by the Master of the Rolls, in Pilling v. Armitage, 12 Ves. 78, and in 19 Ves. 156, by Lord Eldon, and would be applicable to our lands unoccupied and in the forest. It is an outstanding secret title that cannot be asserted by him who conceals such title from an innocent purchaser.
It has been already remarked that the Legislature required the contract to be in writing, and that the Court can require nothing less; that part performance is only- evidence of a secondary character of the contract, weaker than direct parol proof, and 'consequently inadmissible. Set aside, then, the circumstance that Judge Searcy improved the property by building thereon, and what is there in the present cause to sustain the bill ? Nothing but the naked parol contract, without any price having been fixed upon for the ten feet of ground, or any consideration having been paid therefor.
That this bill was filed and the decree for a specific performance pronounced in the Circuit Court upon the ground of part performance on the part of Searcy, cannot be doubted ; for if Searcy had never built upon the ground, it is most certain that the chancellor below would not have divested the title to the land out of M’Clure, and vested it in Patton without decreeing any compensation to M’Clure for the property.
[341] This Court is now asked to grant a perpetual injunction against the operation of M’Clure’s title at law. Suppose it were to do so; would this not be doing that indirectly which the Court possesses no power to db directly ? Enforcing the parol contract because of the part performance. What would be the difference in effect between a decree divesting the title, and a decree perpetually enjoining M’Clure from disturbing the possession *640 of Patton ? Surely none. It was well remarked by the defendant’s counsel in this cause, that if the courts once enforce the Statute of Frauds strictly, then no man will be deceived, for until the contract is written, it will be deemed not to exist, and all controversy and danger of perjury by parol proof, will be cut off. Courts of chancery will then be called upon to execute men’s contracts, not to make them, as would be the case in the present instance, were we to execute this parol contract, where we have no knowledge, even from any parol proof in the cause, what consideration was to be paid to M’CIure for his property. Some of the witnesses say it was part of another lot of equal value with the ten feet upon the square, but how much of the other lot is left for this Court to settle. Others say Searcy was to pay in money, but how much is left for the Court to conjecture, or ascertain from proof. The Circuit Court found so much uncertainty upon this point that in the decree it is not noticed, and the title vested in Patton without decreeing any consideration therefor to M’CIure. The bill does not even allege what consideration was to be given, but says, “ the said Hugh M’CIure was to give said B. Searcy what said ground was reasonably worth.” That Searcy ever paid anything towards the ground is not alleged, but the reverse, with a submission to pay what it was reasonably worth. Here the allegation is one way, the proof another, and conflicting ; and this Court is asked to make so much of the contract as fixes the value of the ground, and thus cause it to be executed by a specific decree ; or, in other words, to infer the contract from the part performance, and then execute it. Such were the grounds upon which the decree proceeded. I can say for myself that I could hardly imagine [842J a doctrine fraught with more mischief than for a court of equity to infer a contract because of a part performance, and then execute it by a decree divesting title.
It has been supposed that the cause of Dudley Cox’s Heirs v. Cox & Talbot, Peck’s Rep. 443, had decided the point that part performance took a pax-ol contract for the sale of lands out of the Statute of Frauds. The fact will be found otherwise, when the cause is examined. In that cause Reid Cox sold to Haynes a tract of land for $ 1,200, and gave his bond to Haynes for a title. Afterwards Haynes gave the land and delivered the title-bond to his son-in-law Hill. Reid Cox then proposed to purchase the land from Hill for Dudley Cox, the brother of Reid. The purchase was made tíy Reid for Dudley at the price of $ 850, which Dudley paid and secured to be paid to Hill. All this time the legal title vested in Reid Cox. To whom the title-bond was delivered by Hill did not appear, nor was,it material, for Reid, as agent, could only receive it for his principal, Dudley.
Shortly after this Dudley Cox died and left William Cox one of his executors, who alone qualified, and had the whole management of his estate. The land, before the death of Dudley Cox, had been in his pos *641 session, and continued in that of his heirs, the complainants, after his death, and the rents were received by Neal, their guardian.
Presently William Cox, the executor, purchased the land from Reid Cox and sold it to Talbot, to whom Reid made a deed for the same, wholly disregarding the purchase from Dudley to Hill. All the papers of Dudley Cox had fallen into the hands of his executor, William Cox, and no account could be given of the title-bond from Reid Cox to Haynes.
Dudley Cox had devised the land to his three daughters, minor children, who by their guardian filed their bill to set the conveyance to Talbot aside, and for the specific decree upon the title-bond as against Reid Cox.
Talbot had notice of the facts fully before he purchased. Reid Cox in his answer relied upon the Statute of Frauds for a defence, amongst other things. The cause, as above stated, was pretty satisfactorily made out by the proofs and the answers.
[343] The Court, in their opinion, felt themselves warranted in presuming that the title-bond had been assigned to Dudley Cox, and that it had come to the hand of his executor, William Cox, inasmuch as it was not produced accounted for by William or Reid Cox, in whose power it was to do so.
The question, whether Reid Cox could protect himself by the Statute of Frauds, was ably discussed, and the Court decided that he could not, because he had given a title-bond to Haynes, which was assigned to Hill, and by him, they would presume, to Dudley Cox. The fact most probably was, that Hill had delivered the bond to Reid Cox, who was purchasing for Dudley.
The Court, secondly, decided that Reid Cox, William Cox, and Talbot had, with a full knowledge of the equity of Dudley Cox’s heirs, combined themselves together to cheat the minor heirs out of the land, and therefore held as trustees of the heirs of Dudley Cox.
The whole transaction, as between Reid Cox, William Cox, and Talbot was declared fraudulent and void; *and of course Dudley Cox’s heirs left free to proceed upon the title-bond of Reid Cox to Haynes, which was assigned to Hill, and from him to Dudley Cox, as the Court presumed.
True, the Court do hold the doctrine that a part performance will take a case out of the Statute of Frauds; but once establish the fact that Reid Cox’s bond came to Dudley Cox by assignment, and it is not to be conceived how the question could arise. The opinion is learned and able, and the decree indisputably correct; but is necessarily based upon facts wholly beside the question of the defence of the Statute of Frauds, relied upon in Reid Cox’s answer; and hence not binding upon the Court as an adjudicated point.
It will be here remarked that I am the more confirmed in the opinion now delivered in opposition to the construction given to the Statute of Frauds in the English Court of Chancery, because the late lamented Judge *642 Crabb fully concurred in. the construction here given. Not judicially, to ' be' sure, but with a knowledge that it would be presented to the Court at this term in several causes. We both deemed [344] the question open, and thought it of more importance than any one, in all probability, that would arise before the Court during our judicial existence, and had prepared to meet it with a decision satisfactory to ourselves. The above was the result of our deliberations. In that gentleman’s talents, legal acquire-ments, discretion, and firmness in meeting great questions, I had much confidence.
I say thus much because it is a well-known fact that the late Judge Haywood was of a different opinion, and thought a part performance would take a case out of the Statute. The distinguished ability and learning of this gentleman, together with his age and experience, gave to his opinions upon legal subjects a weight of authority accorded to few men in a judicial station, and well authorized younger men upon the bench to distrust their judgments, and to draw upon every legitimate source of information for aid when they found themselves under the necessity of doubting the correctness of such opinions, which were furthermore in accordance with the adjudications of other countries pronounced by judges inferior to none for talents and learning that any age or nation has produced. In forming my opinion, however, upon the construction of the Statute of Frauds, I have thought it my duty not to compromise with that of any brother judge; in most other causes I should feel it a duty to act otherwise.
The appalling train of litigation resulting from a departure from the words of the Statute in England is a solemn warning to the courts of this State not to fall into similar error; for the courts of that country now admit them to have been errors, and would most willingly return to the words of the Statute, were it possible to do so consistently with the construction but too well settled by their ancestors, which virtually repeals the Act, and has given rise to as much fraud and perjury, in all probability, to bring causes within the various exceptions made by the courts as would have arisen had the Statute never been passed. Whether the Statute has done more good than harm to the people of England, is at this day a doubtful question.
It has been asked by those who advocate the present [345] construction of the Statute in the courts of Great Britain as the correct one, why, if the people of that country are dissatisfied with such construction, the Parliament does not pass another law which the courts would be bound strictly to pursue. To this it may be answered that no combination of words in the language could make a more plain and forcible provision; and hence such legislation would be idle; the present settled construction of the old Statute would equally apply to the new one.
The first error in departing from the letter of the Statute in England *643 grew out of the assumed power in the Court of Chancery to relieve against cases of particular hardship falling within the provisions of statutes, upon the supposition that the Legislature could not have intended to include such a case. This assumed power was in violation of the well-settled rule of the common-law courts in the construction of statutes, that where the Legislature makes a general provision without making any exceptions, the courts cau make none ; that it would be legislating to do so. Hall v. Wyburn, 2 Salk. 420; Aubury v. Fotescue, 10 Mo. Rep. 206, 4 Bac. Ab. 480; Batlay v. Falkner, 3 Bar. & Ald. Rep. 288; M’Iver v. Regan, 2 Wheat. 29; Troup v. Smith, 20 John. Rep. 33; Hamilton v. Smith, 1 Murp. N. C. Rep. 115; Callis v. Waddy, 2 Mun. Rep. 511. The foregoing doctrine, as applicable to courts of common law, was fully recognized by this Court in the cause of M’Ginnis v. Jack and Cocke, infra 361, in Knoxville, in 1825, the opinion in which is referred to as containing the settled decision of this Court.
The proposition that courts of equity are bound equally with courts of law, by a statute, will be stated as unquestionable; because to hold otherwise would be setting at naught the legislative power, when coming in conflict with the courts of chancery, and rendering it dependent upon these tribunals; whereas the Constitution declares it shall be independent. If authority, however, were wanting to prove this, it would be found in the causes of Shelby v. Shelby, Cook’s Rep. 176; Porter’s Lessee v. Cocke, Peck’s Rep. 30; Elmondorf v. Taylor, 10 Wh. 153, and in the Marquis Chlomondeley v. Lord Clinton et als. 2 Jac. & Walker’s Rep. 1.
[346] The simple principle decided in the cause of M’Ginnis v. Jack and Cocke was, that where a statute made a general provision without any exceptions, that the courts of law had no power to make any. If the courts of equity are equally bound by a statute with the courts of law, and have no more power to make exceptions, does it not follow that the principle decided in that cause must also govern this ? I thought at the time the decision was made, it would apply to a case like the present, and now think the principle perfectly conclusive when applied to the cause before the Court, and every other, where exceptions to the provisions of the Statute of Frauds are relied upon.
It is almost useless to add, that one exception or part performance more than another will not take a case out of the Statute when the foregoing principle is applied as the rule of decision. The only question to be asked a complainant applying to the Court for aid to enforce a contract for the sale of lands, is: Have you the writing required by the Statute of Frauds evidencing your purchase ? If the answer is in the negative the response by the Court must in every case be the same: Your contract is void, your parol evidence inadmissible, and the Court can neither hear nor help you. Such is the pase of the present complainant. I therefore think the decree below should be reversed and the bill dismissed.
*644 Whyte J.,
after stating the case, proceeded. Upon the above state of facts, the Circuit Court decided that all the right, title, claim, and interest of Hugh M’Clure, in and to the said ten feet of ground, running ten feet on the square and fifty feet back, be divested from the said Hugh M’Clure, and that the same be vested in the said John Patton, and that there be a perpetual injunction against the judgment at law, and the defendant pay the costs in this behalf expended.
In support of this decree of the Circuit Court, it was argued by the appellee’s counsel, that the same should be affirmed on two grounds. 1st. That though the contract stated in the bill was a verbal contract, not reduced to writing, [347] yet being carried into execution on the part of the vendor, by delivery of possession, and enjoyment permitted under it; and on the part of the vendee by compensation made in value to the vendor, in other land to his satisfaction, and the 'acceptance thereof, and taking possession with the consequent enjoyment. An execution of the contract had taken place between the parties, taking the case out of the operation of the Statute of Frauds, 1801, ch. 25, § 1. 2d. That if this Court would not affirm the decree on this ground, and follow the construction given by English judges to their Statute of Frauds, which on this point is substantially the same with our Statute, yet the decree ought to be affirmed, and supported oil this ground of equity, founded on the conduct of the parties, that when a person, believing he has a right or a permission, does acts in conformity with that belief, and the person having the legal right stands by, acquiesces in the acts done without forbidding them or disclosing any intention of exerting his legal right, he shall be concluded upon his conduct, and be enjoined by equity from enforcing the legal right to the injury of that other person, and in disaffirmance of the acts done that he has so tacitly permitted.
As to the first ground, the bill states a formal contract for the sale of land. The answer denies that contract, and one positive witness, Mrs. Murrell, with corroborating circumstances, which are existing in the cause, proves the contract. It must, therefore, by the practice in chancery, be taken as established. It must be taken as established also, upon the same testimony, and circumstances in corroboration, that the said contract was fully consummated by the parties, with the exception that it was not sanctioned by writing.
This brings the construction of our Statute of Frauds directly before this Court, and makes a question not entirely new-to it, but one generally considered by the profession, both the bar and the Court, as unsettled. Decisions have been given in the courts below both ways ; and something has been said upon it by this Court which will be noticed. The first case occurring in this Court was in 1812, within [348] eleven years after the passage of the Statute of Frauds, and within two years after the organization of this Court. It was the case of Townsend v. Sharp, 2 Tenn. Rep. *645 192. The view the judges have taken of this Statute, and what construction ought to be given it, is thus expressed in their opinion in that case. “ If courts,” say they, “ could content themselves in cases arising under the Statute, with letting them be governed by the natural meaning of the words nsed in it, the law would be in such a situation, that in contracts respecting lands, it would be understood by the meanest capacity ; and it is thought very questionable, after a pretty long experience in England, whether the exertions of courts in that country to exempt cases from the operation of their Statute, which fell within its words, have not been productive of more mischief than benefit.” Again they say, “ it is conceived that courts in this country, when fixing a construction on a statute of their own, are not bound to adopt the same interpretation which the English judges have put upon one of their statutes which uses similar expressions.” The second case that occurred in this Court was in 1824, twenty-three years after passing the Statute, and twelve years after the case of Townsend v. Sharp. It was the case of Cox and Others v. Cox and Others, Peck’s Rep. 443. The judges there also gave their view of our Statute, and the construction that it ought to have. In page 456 they say: “These decisions were well known to the Legislature, and if they had intended to guard against any construction put upon the Statute in England, they would certainly have used words to convey that intention. It is very obvious that they merely meant to put in our statute-book a statute, which, it is believed, had not long before the passage of that Act been decided not to be in force in this State. Hence they enacted a literal copy of the British Statute, but had no intention of changing the law in that particular ; for the law in England at the time of passing our Statute was not only the Statute itself, but also the decisions that had been made in the courts of that country on that Statute.”
These two cases are the. only ones which it is incumbent on this Court to notice. I am not aware of any other case [849] decided in the Supreme Court upon this question ; and admitting the two cases above cited, equally respectable, the former, being first in point of time, hath, on that ground, the preference in point of authority, being an early construction, and the first case after the passage of the Statute. Priority of construction upon a statute runs through all the books as a circumstance of weight conferring authority. It is laid down in Bac. Abr. Statute I. 5, that “ great regard ought, in construing a statute, to be paid to the construction which the sages of the law who lived about the time, or soon after it was made, put upon it, because they were best able to judge of the intention of the makers. It is moreover a maxim, that “ contemporánea expositio estfortis-sima in lege.” See also Stewart v. Laird, Cranch, 299. The evils consequent upon the construction given to the English Statute of Frauds have been often alluded to, and much regretted, both by its late and present *646 learned judges. This course of thinking on the English bench, the able judges who decided the case of Townsend v. Sharp were well apprised of, and approved, as appears by their opinion delivered in that cause, which, together with the well-known intention of the Legislature expressed in the Act itself, no doubt produced the sentiments and declarations upon our Statute, in that case contained. I have said the well-known intention of the Legislature is expressed in the Act itself. This fully appears by reference to its words, which are these: “ No action shall be brought whereby to charge the defendant upon any contract for the sale of lands, tenements, or hereditaments, unless some memorandum or note thereof shall be in writing and signed by the party charged therewith, or some other person by him thereunto lawfully authorized.” Can a doubt be raised on this diction ? Is not the intention evident, that the contract for the sale of land must be in writing, or some memorandum or note thereof must be in writing, to charge the party: if so, and he is charged by any other means, or in any other manner than by a writing, he is not charged by the Act. For instance, a case of verbal contract for land, and payment of the consideration, or performance, these not being in the Act, but [350] foreign and extrinsic to it: if the Court should say their existence shall be equal to, or dispense with a .writing, it will be a legislation, not a construction; it will be adding exceptions to the operation of a general law by the Court, where the Legislature have made none, and will, in effect, be making a new or another statute, pro tanto. Such a power existent in a court is repelled, in modern times at least, by the best authorities. In Sturges v. Crowningshield, Chief Justice Marshall says, “ It would be dangerous in the extreme to infer from extrinsic circumstances that a case for which the words of an' instrument expressly provide shall be exempted from its operation.” 4 Wheat. 202. Let us apply this principle to the present case. By this Statute the case of the person (M’Clure in this cause) who is attempted to be charged without writing is expressly provided for, he shall not be charged by the Act; and shall this Court, by construction, say that the extrinsic circumstances of performance or payment of the consideration shall oust or deprive him of its protection ? The above case and principle forbid it.
I am therefore of opinion that the appellant, M’Clure, in this case is entitled to the benefit of the Statute of Frauds, 1801, ch. 25, claimed by him in his answer; because the contract for the land, by which it is attempted to charge him, was not in writing, nor any memorandum or note thereof in writing signed by him, or by some other person by him thereunto lawfully authorized, and. that the performance, payment, and satisfaction made by virtue of the verbal contract, appearing in the evidence in the cause, do not take the appellee’s case out of the Statute.
Upon the second ground taken by the appellee’s counsel in support of *647 the decree of the Circuit Court, it is not necessary for me to examine particularly whether the evidence comes up to the ease required by a court of equity for its interference in restraint of the legal right for the protection of the party who has done acts either in ignorance of that right, or with the acquiescence of or by the permission of him who has that legal right, where the Court, acting upon the principle that such conduct in the holder [351] of the legal.right is fraudulent, gives relief; as upon a careful examination of the appellee’s bill that defence cannot be set up in this case ; though at present I am of opinion that the case made out by the evidence would be sufficient for relief if, by the rules of practice in chancery, it could be used and applied. I will on this point barely observe that that particular ground is taken by the appellant’s counsel to repel the case made on the other side, predicated on the testimony of Mrs. Murrell, to wit: that the appellee knew the deficiency of his title, and that his vendor, J. Searcy, knew the same thing, and therefore they proceeded in their own wrong, and at their own risk. This objection is answered by the case of Jackson v. Cator, a case where this doctrine was acted upon and relief given. Lord Eldon there says : “ The objection that the plaintiff knew the infirmity of his title and should have taken a security, applies to all the cases, but it is very strong here, for he must have seen his intention to, beautify the place could not be executed without the assent of the defendant, &c., &c. I have no difficulty in enjoining him (that is, defendant), but it is upon his conduct since the execution of the lease, not upon the evidence of the conversation as to the agreement. 5 Ves. 692.
The bill of the appellees is founded wholly in contract. It sets forth the formal contract between M’Clure and Searcy, and says that Searcy was to pay for the ground what it was reasonably worth ; states that Searcy built a dwelling-house, or part of a house, on the land, and that other houses were afterwards raised on the land; that Patton measured the land in dispute with other lots in 1817 for Searcy; and M’Clure, in 1820, brought his ejectment. A specific performance of the contract is prayed for by Patton, offering at the same time to perform on his part what may be required of him ; he also prays an injunction against the obtaining of a writ of possession if judgment should be rendered against him on the ejectment, and prays general relief. But there is no allegation in the bill that M’Clure stood by, saw the houses built, and other acts stated in the evidence done, and made no objection, or, being present, acted and [352] behaved himself as if assenting thereto. No proofs can be taken in a cause that are not authorized by the pleadings, and if irregularly taken they cannot be used ; for the decree must be rendered as well secundum, allegata as secun-dum probata. The case of Crockett v. Lee, 7 Wheat. 525, is very full and satisfactory on this point, which I shall cite at some length, being much better than anything I could say. Chief-Justice Marshall delivered the *648 opinion of the Court. “ No rule is better settled than that the decree must conform to the allegations, as well as to the proofs in the cause, the location being set out in the pleadings, the Court can notice any apparent intrinsic defect. If it be void in the bill, no testimony can sustain it; if not void in itself, but its validity depends on facts to be proved in the cause, then its validity ought to be put in issue. The counsel for the appellant says it would be monstrous if, after the parties have gone to trial on the validity of the entry, and have directed all their testimony to that point, their rights should be made to depend, in an appellate court, on a mere defect in the pleadings, which had entirely escaped their observation in the court where it might have been amended, and the non-existence of which would not have varied the case.
“ The hardship of a particular case would not justify this tribunal in prostrating the .fundamental rules of a court of chaiicery, — rules which have been established for ages on the soundest and clearest principles of general utility. If the pleadings in a cause were to.give no notice to the parties, or to the Court, of the material facts on which the right asserted was to depend, no notice of the points to which the testimony was to be directed, and to which it was to be limited ; if a new case might be made out in proof, differing from that in the pleadings, all will perceive the confusion and uncertainty which would attend legal proceedings, and the injustice which must frequently take place. The rule that the decree must conform to the allegations, as well as to the proofs of the parties, is not only one which justice requires, but one which necessity imposes in courts; we cannot dispense with it in this case.”
The proofs respecting the conduct of the appellant .not [353] being admissible under any allegation in the bill, cannot be acted upon by this Court. I am therefore of the opinion that the decree rendered in this cause by the Circuit Court be reversed, and the appellee’s bill dismissed, but no costs given.
Peck, J. dissented.
Decree reversed.